**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RENEE THOMPSON,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 12-530** |
| | ) | **Electronically Filed** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

### I.    Introduction

Plaintiff Renee Thompson ("Thompson") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act") [42 U.S.C. §§ 401-433, 1381-1383f].  The matter is presently before the Court on cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56.  For the reasons that follow, the Court will deny Thompson's motion for summary judgment (*ECF No. 10*), grant the Commissioner's motion for summary judgment (*ECF No. 12*), and affirm the Commissioner's administrative decision.

### II.    Procedural History

Thompson[1] initially applied for benefits under Title II on July 10, 2007, alleging that she had become "disabled" on April 30, 2007.  R. 57.  The application was administratively denied on September 7, 2007.  R. 57.  Twelve days later, Thompson requested an administrative

---

[1] Thompson was previously known as "Renee Taylor."  R. 54.  She got married on March 3, 2010, and changed her last name to "Thompson."  R. 25-26.

hearing.  On November 5, 2008, a hearing was held in Morgantown, West Virginia, before

Administrative Law Judge Richard D. Brady.  R. 57.  In a decision dated March 16, 2009, Judge

Brady determined that Thompson was not "disabled" within the meaning of the Act.  R. 54-66.

Thompson apparently took no further action with respect to that application.  R. 147.

On April 22, 2009, Thompson protectively applied for both DIB and SSI benefits.  R. 10,

103, 112.  She again alleged that her "disability" had begun on April 30, 2007.  R. 103, 112.

Pennsylvania's Bureau of Disability Determination denied the claims on September 2, 2009.  R.

77, 81.  Thompson responded on October 12, 2009, by filing a timely request for an

administrative hearing.  R. 89-90.  On November 3, 2010, a hearing was held in Pittsburgh,

Pennsylvania, before Administrative Law Judge ("ALJ") Lamar W. Davis.  R. 22-53.

Thompson, who was represented by counsel, appeared and testified at the hearing.  R. 26-49.

Samuel Edelmann ("Edelmann"), an impartial vocational expert, also testified at the hearing.  R.

49-52.  In a decision rendered on December 3, 2010, the ALJ determined that Thompson was not

statutorily "disabled."[2]  R. 7-17.

On January 5, 2011, Thompson sought administrative review of the ALJ's decision by

filing a request for review with the Appeals Council.  R. 5-6.  The Appeals Council denied the

request for review on February 28, 2012, thereby making the ALJ's decision the "final decision"

of the Commissioner in this case.  R. 1.  Thompson commenced this action on April 20, 2012,

seeking judicial review of the Commissioner's decision.  ECF Nos. 1 & 4.  Thompson and the

Commissioner filed cross-motions for summary judgment on October 2, 2012.  ECF Nos. 10 &

12.  Those motions are the subject of this memorandum opinion.

---

[2] The ALJ made no reference to Judge Brady's earlier decision.  R. 10-17, 57-66.  Thompson's claims were
considered for the period of time commencing on her alleged onset date of April 30, 2007, even though Judge Brady
had already determined that she was not "disabled" as of March 16, 2009.  R. 10-17, 57-66.  It is not clear whether
the ALJ was aware of the prior disposition.

## III.    Standard of Review

This Court's review is plenary with respect to all questions of law. *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). A United States District Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191(3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental

impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rule making authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (footnotes omitted).  Factual findings pertaining to all steps of the sequential evaluation process are subject to judicial review under the "substantial evidence" standard.  *McCrea v. Commissioner of Social Security*, 370 F.3d 357, 360-361 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision.  In *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context.  *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001).  Thus, the Court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

**IV.    The ALJ's Decision**

In his decision, the ALJ determined that Thompson had not engaged in substantial gainful activity subsequent to her alleged onset date.  R. 12.  Thompson was found to be suffering from asthma, a strain in her lower back, and bipolar disorder.  R. 12.  These impairments were deemed to be "severe" under the Commissioner's regulations.  R. 12; 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c).  The ALJ concluded that Thompson's impairments

did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 12-13.

In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ assessed Thompson's "residual functional capacity"[3] as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform simple, routine, repetitive light work that does not require exposure to temperatures below 40 or above 90 degrees, fumes, dust, airborne particulates or humidity greater than 90 percent. The claimant cannot interact with the general public and have no [sic] more than incidental interaction with co-workers.

R. 14. Thompson had "past relevant work"[4] experience as a home health aide, cashier and warehouse pricer. R. 16. In response to a hypothetical question describing an individual with the functional limitations contained in the ALJ's residual functional capacity assessment, Edelmann testified that the described individual could not perform the duties of Thompson's prior jobs. R. 49-50. Therefore, it was determined that Thompson could not return to her past relevant work. R. 15-16.

Thompson was born on December 5, 1981, making her twenty-five years old on her alleged onset date and twenty-eight years old on the date of the ALJ's decision. R. 16, 26. She was classified as a "younger person" under the Commissioner's regulations. 20 C.F.R.

---

[3] The term "residual functional capacity" is defined as "that which an individual is still able to do despite the limitations caused by his or her impairments." *Hartranft v. Apfel*, 181 F.3d 358, 359, n. 1 (3d Cir. 1999)(parentheses omitted), citing 20 C.F.R. § 404.1545(a). The same residual functional capacity assessment is used at the fourth and fifth steps of the sequential evaluation process. 20 C.F.R. §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii).

[4] "Past relevant work" is defined as "substantial gainful activity" performed by a claimant within the last fifteen years that lasted long enough for him or her to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). The Commissioner has promulgated comprehensive regulations governing the determination as to whether a claimant's work activity constitutes "substantial gainful activity." 20 C.F.R. §§ 404.1571-404.1576, 416.971-416.976.

§§ 404.1563(c), 416.963(c).  She had the equivalent of a high school education[5] and an ability to communicate in English.  R. 27, 126, 132.  Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Thompson could work as a motel cleaner, an office cleaner, or a stock clerk.  R. 16.  Edelmann's testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).[6]  R. 51.

## V.    Discussion

During the four and a half years immediately preceding her alleged onset date, Thompson worked as a cashier[7] for a convenience store.  R. 128.  On April 30, 2007, she "flipped out" at work and lost her job.  R. 127, 194.  Shortly thereafter, Thompson sought psychiatric treatment from Dr. Manojbhai P. Patel.[8]  Dr. Patel evaluated Thompson on July 10, 2007, and determined that she was suffering from bipolar disorder.  R. 189.  Two months later, Thompson started to participate in weekly counseling sessions with Lenley Lewis ("Lewis"), a mental health therapist.  R. 348.

On October 6, 2007, Thompson went to Washington Hospital's[9] emergency room and stated that she "wanted to wreck her car and kill herself."  R. 194.  She also described thoughts of strangling her sister and shooting her former boss.  R. 194.  After conveying those ideations,

[5] The record indicates that Thompson obtained her General Educational Development ("GED") certification in 1999. R. 132.  She testified that a district justice had ordered her to secure her GED certification after she had been convicted of criminal trespass.  R. 27.

[6] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy."  *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003).  This burden is commonly satisfied by means of vocational expert testimony.  *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

[7] The Court uses the term "cashier" because that is how Edelmann characterized the position.  R. 49.  When she applied for benefits, however, Thompson reported that the position had included managerial duties.  R. 128.

[8] Since Thompson challenges only the portion of the ALJ's residual functional capacity assessment relating to her mental limitations, there is no need for the Court to discuss her physical impairments.  ECF No. 11 at 12-23.

[9] Washington Hospital is located in Washington, Pennsylvania.  R. 190-191.

Thompson voluntarily admitted herself to the Behavioral Health Unit pursuant to 50 PA. STAT. § 7201. R. 130, 191, 194. Dr. Patel was her attending psychiatrist. R. 196. Thompson was discharged from inpatient treatment on October 8, 2007. R. 191. She was given prescriptions for Geodon, Prozac, Pepcid and Tegretol. R. 191. Dr. Patel reported that Thompson had been "discharged in stable condition." R. 192.

After her brief hospitalization, Thompson continued to seek treatment from Dr. Patel and Lewis. R. 216-223, 264-265, 305-347. On April 23, 2009, Dr. Patel submitted a statement to Pennsylvania's Department of Public Welfare ("DPW") declaring Thompson to be "permanently disabled." R. 380. He reported that Thompson's "disability" had begun on April 30, 2007, and that it had been caused by her bipolar disorder. R. 380-381.

Dr. Sharon Becker Tarter, a non-examining psychological consultant, reviewed Thompson's medical records in connection with her applications for DIB and SSI benefits. On August 19, 2009, Dr. Tarter opined that Thompson was "able to meet the basic mental demands of competitive work on a sustained basis." R. 249. In the narrative portion of her consultative report, Dr. Tarter explained:

> The claimant's basic memory processes are intact. She can make simple decisions. She is capable of asking simple questions and accepting instruction. She can sustain an ordinary routine without special supervision. Moreover, she retains the ability to perform repetitive work activities without constant supervision. There are no restrictions in her abilities in regards to understanding and memory.

R. 249. Thompson's subjective complaints were deemed to be only "partially credible." R. 249. Nevertheless, Dr. Tarter reported that Thompson was "moderately" limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule, maintain regular attendance, be punctual within customary

tolerances, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with members of the general public, accept instructions, respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. R. 247-248.

In a mental residual functional capacity questionnaire dated April 15, 2010, Lewis indicated that Thompson had "[n]o useful ability to function" in the areas of working in coordination with (or proximity to) others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically-based symptoms, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, interacting appropriately with members of the general public, and maintaining socially appropriate behavior. R. 350-351. Lewis further asserted that Thompson was "[u]nable to meet competitive standards" in the areas of maintaining attention for two-hour segments, maintaining regular attendance and punctuality within customary tolerances, sustaining an ordinary routine without special supervision, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to changes in a routine work setting, dealing with normal work stress, dealing with the stress typically associated with semi-skilled and skilled jobs, and traveling in unfamiliar places. R. 350-351. Serious limitations were identified with respect to Thompson's abilities to remember work-like procedures, make simple work-related decisions, ask simple questions, request assistance, set realistic goals or make plans independently of others, use public transportation, and understand, remember and carry out detailed instructions. R. 350-351. Thompson's abilities to take appropriate precautions for normal hazards, adhere to

basic standards of neatness and cleanliness, and understand, remember and carry out short, simple instructions were deemed to be "[l]imited but satisfactory." R. 350-351. Lewis predicted that Thompson's mental condition would necessitate more than four absences per month if she were to secure a full-time job. R. 351. In response to a question posed by Thompson's counsel, Edelmann testified that no jobs existed in significant numbers in the national economy for an individual who needed to miss more than two days of work per month.[10] R. 52.

In his decision, the ALJ stated that Dr. Patel had "grossly exaggerate[d]" Thompson's mental limitations. R. 15. Lewis' assessment was rejected on the ground that it had not been "proffered by a treating source or psychiatrist" and was "in direct contradiction with the medical record." R. 15. The ALJ found Dr. Tarter's assessment to be "consistent with the medical record" and adopted her findings. R. 15. He noted that Thompson's mental condition was primarily attributable to "poor sleep, irritability and the stressors associated with child rearing." R. 15.

Thompson argues that the ALJ erred in crediting the consultative opinion provided by Dr. Tarter over the conflicting assessments supplied by Dr. Patel and Lewis. ECF No. 11 at 12-15. When all other factors are equal, it is inappropriate for an administrative law judge to credit the opinion of a non-examining consultant over that of a treating physician. *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 357 (3d Cir. 2008). Nonetheless, the opinion of a treating physician does not inevitably control the determination as to whether a claimant's functional limitations preclude the performance of substantial gainful activity. *Brown v. Astrue*, 649 F.3d 193, 196, n. 2 (3d Cir. 2011). Every medical opinion, regardless of its source, must be

---

[10] The inquiry required under the Social Security Act does not account for any "reasonable accommodations" mandated by Title I of the Americans with Disabilities Act of 1990 [42 U.S.C. §§ 12111-12117]. *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 803, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 95 (3d Cir. 2007).

afforded some consideration. *Williams v. Sullivan*, 970 F.2d 1178, 1185, n. 5 (3d Cir. 1992). Under certain circumstances, the findings of a treating source can be outweighed by the findings of a non-examining consultant. *Brown*, 649 F.3d at 196-197; *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991).

The ALJ partially based his rejection of Lewis' opinion on the fact that it had not been proffered by a psychiatrist. R. 15. Although an individual must qualify as an "acceptable medical source" in order to confirm the existence of a medically determinable impairment, information provided by "other sources" may be used to determine the extent to which an established impairment limits a claimant's ability to engage in work-related activities. 20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d). The United States Court of Appeals for the Third Circuit has recognized that opinions provided by "other sources," though relevant to the residual functional capacity inquiry, are generally entitled to less *weight* than opinions provided by "acceptable medical sources." *Hartranft*, 181 F.3d at 361-362. Consequently, it was permissible for the ALJ to credit Dr. Tarter's assessment over that of Lewis. *Chandler v. Commissioner of Social Security*, 667 F.3d 356, 361-362 (3d Cir. 2011).

Thompson maintains that the ALJ improperly rejected Dr. Patel's opinion. ECF No. 11 at 12-15. As an initial matter, Thompson incorrectly attributes some of her own statements to Dr. Patel. *Id.* at 12. On the "medical assessment form" submitted to the DPW, Thompson stated that she was suffering from bipolar disorder and depression, that she had an autistic son who needed around-the-clock care, that she could not "concentrate on anything" or "stay focused," and that she was "always having mood swings." R. 379. Thompson put those statements in writing on April 27, 2009. R. 379. Three days later, Dr. Patel signed a separate portion of the form and declared Thompson to be "permanently disabled" due to bipolar disorder. R. 380-381.

Although Dr. Patel may have agreed with Thompson's statements, the portion of the form containing those statements cannot be reasonably characterized as his "assessment" of her abilities and limitations. ECF No. 11 at 12.

Standing alone, Dr. Patel's statement declaring Thompson to be "permanently disabled" amounted to nothing more than a legal conclusion. The ultimate question of "disability" is reserved for the Commissioner's determination. *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Under the Commissioner's regulations, unsupported opinions of "disability" provided by treating physicians do not qualify as "medical opinions" entitled to consideration. *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003); *Luce v. Astrue*, 523 F.Supp.2d 922, 936 (S.D.Iowa 2007); *Earl-Buck v. Barnhart*, 414 F.Supp.2d 288, 293 (W.D.N.Y. 2006); *Wheat v. Barnhart*, 318 F.Supp.2d 358, 364, n. 11 (M.D.La. 2004); 20 C.F.R. §§ 404.1527(d), 416.927(d). A true "medical opinion" specifically explains what a claimant can or cannot do in light of his or her medical condition. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The availability or unavailability of jobs consistent with a claimant's established abilities and limitations raises a *vocational* question rather than a *medical* question. 20 C.F.R. §§ 404.1566(e), 416.966(e). In *Willis v. Baxter International, Inc.*, 175 F.Supp.2d 819 (W.D.N.C. 2001), the United States District Court for the Western District of North Carolina explained:

> Absent a showing of vocational expertise, courts, as well as disability adjudicators, give little deference to the opinions of medical doctors on the ultimate determination of "disability." While many doctors are willing to sign letters drafted by attorneys that the patient/client is completely disabled, those opinions carry little weight, and the discussions in the pleadings concerning whether a doctor did or did not find plaintiff to be disabled are not critical to decision. It is a doctor's medical findings, however, that are most helpful in determining what impairments are interfering with the plaintiff's ability to work. Indeed, such medical information is most informative on the issue of severity of the impairments.

*Willis*, 175 F.Supp.2d at 832. Since Dr. Patel's "opinion" related to the underlying legal issue of "disability" rather than to "the nature and severity" of Thompson's impairments, the ALJ was not required to evaluate it under the specific criteria enumerated in the Commissioner's regulations. *Frank*, 326 F.3d at 620; 20 C.F.R. §§ 404.1527(c), 416.927(c). Furthermore, the ALJ acted within his discretion in deciding to credit the more detailed assessment provided by Dr. Tarter instead of the conclusory statement made by Dr. Patel. *Brown*, 649 F.3d at 196-197; *Jones*, 954 F.2d at 129.

At the second and third steps of the sequential evaluation process, a claimant's mental impairments must be evaluated with reference to "four broad functional areas." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). One of those areas is a claimant's maintenance of "concentration, persistence, or pace." *Id.* Dr. Tarter opined that Thompson had a "moderate" degree of limitation with respect to that area. Although a "moderate" limitation was sufficient to support a finding of "severity" at the second step of the process, it did not satisfy the alternative criterion for *per se* disability under the Listings pertaining to mental disorders.[11] 20 C.F.R. §§ 404.1520a(d)(1)-(3), 416.920a(d)(1)-(3). The ALJ concurred in Dr. Tarter's conclusion that Thompson experienced "moderate" difficulties in maintaining her concentration, persistence, or pace. R. 13.

A vocational expert's testimony cannot be relied upon to establish the existence of jobs in the national economy consistent with a claimant's residual functional capacity unless the question eliciting that testimony incorporates all of the claimant's functional limitations. *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). Thompson argues that the ALJ's residual functional capacity assessment (and corresponding hypothetical question to Edelmann) did not

---

[11] The ALJ evaluated Thompson's mental impairment under Listing 12.04. R. 13. A "marked" limitation in one's maintenance of concentration, persistence, or pace is among the "B" criteria for that Listing. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04.

properly account for her "moderate" difficulties in maintaining her concentration, persistence, or pace. ECF No. 11 at 15-22. The ALJ restricted Thompson to a range of "light"[12] work requiring the performance of only "simple, routine, repetitive" tasks. R. 14. The Commissioner argues that this restriction adequately accommodated Thompson's "moderate" limitation. ECF No. 14 at 7-10.

In *Ramirez v. Barnhart*, 372 F.3d 546, 554-555 (3d Cir. 2004), the United States Court of Appeals for the Third Circuit concluded that a restriction limiting a claimant to one-to-two step tasks had failed to account for her "deficiencies in pace." The holding in *Ramirez* was based on an undisputed observation that the claimant had "often" experienced difficulties in maintaining her pace. *Ramirez*, 372 F.3d at 554-555. The situation in the present case is materially different. Dr. Tarter identified only a "moderate" limitation in the relevant functional area. R. 260. She reported that Thompson could "make simple decisions," "sustain an ordinary routine without special supervision," and "perform repetitive work activities without constant supervision." R. 249. The ALJ's residual functional capacity assessment reflected Dr. Tarter's findings. R. 14. In his decision, the ALJ acknowledged that "poor sleep and irritability" would sometimes "impair [Thompson's] concentration." R. 13. He attributed her mental "struggles" to "poor sleep, irritability and the stressors associated with child rearing." R. 15. Nothing in Dr. Tarter's consultative report or the ALJ's decision described a claimant who "often" experienced "deficiencies in pace." *Ramirez*, 372 F.3d at 554. It is also worth noting that, on most occasions, Dr. Patel found Thompson's "concentration" to be normal. R. 188, 205-213, 215, 218-221, 223. Accordingly, "[t]he medical [evidence] in this case does not endorse a particularized

---

[12] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

accommodation like the one identified in *Ramirez*." *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); see also *McDonald v. Astrue*, 293 Fed.Appx. 941, 946, n. 10 (3d Cir. 2008)(unpublished).

In a final attempt to impugn the ALJ's decision, Thompson appears to dispute Edelmann's testimony concerning the exertional classifications of the motel cleaner and stock clerk positions. ECF No. 11 at 22-23. She maintains that those positions require the performance of tasks at the "heavy"[13] level of exertion. *Id.* at 22. Descriptions of similar positions from the Dictionary of Occupational Titles ("DOT") are attached as exhibits to her brief. ECF Nos. 11-2 & 11-3. It is not clear whether the positions referenced in the portions of the DOT provided by Thompson are the same positions described by Edelmann at the hearing. Edelmann did not provide Specific Vocational Preparation ("SVP") numbers when he identified the positions later relied upon by the ALJ to deny Thompson's claims. R. 51. Nonetheless, Edelmann responded in the affirmative when asked whether his testimony comported with the criteria contained in the DOT. R. 52. Thompson's counsel did not challenge that testimony on cross-examination. R. 52. Even at this juncture, Thompson acknowledges that she cannot sufficiently "flesh out" this issue to undermine the ALJ's factual findings. ECF No. 11 at 23. The Commissioner refutes Thompson's argument by pointing to "light" motel cleaner and stock clerk positions in the DOT that align with Edelmann's testimony. ECF No. 14 at 11.

Under the present circumstances, there is no need for the Court to consider whether Thompson's speculative concerns about Edelmann's testimony would otherwise require a remand for further proceedings. Thompson does not challenge the accuracy of Edelmann's testimony concerning the office cleaner position. ECF No. 11 at 22. Edelmann stated that

---

[13] "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." 20 C.F.R. §§ 404.1567(d), 416.967(d).

260,000 office cleaner positions existed in the national economy.  R. 51.  That figure was alone sufficient to satisfy the Act's requirement that the jobs relied upon by the Commissioner to deny a claimant's application for benefits exist in significant numbers.  *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009).  A remand requesting clarification of Edelmann's testimony relating to the other positions would not affect the outcome of this case.  *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).  In light of this fact, the argument advanced by Thompson provides no basis for disturbing the ALJ's decision.

## VI.    Conclusion

The Commissioner's "final decision" denying Thompson's applications for DIB and SSI benefits is "supported by substantial evidence" and will be affirmed.  42 U.S.C. § 405(g).  Thompson's motion for summary judgment (*ECF No. 10*) will be denied, and the Commissioner's motion for summary judgment (*ECF No. 12*) will be granted.  An appropriate order will follow.

<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge


cc:    All counsel of record